# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:04CV319-H

| | |
|---|---|
| **ROBERT E. DRAG, SR.,** )<br>)<br>　　Plaintiff, )<br>)<br>vs. )<br>)<br>**SOUTHTRUST BANK, and** )<br>**SOUTHTRUST SECURITIES, INC.,** )<br>)<br>　　Defendants. )<br>)<br>_____ ) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Defendants' "Motion to Reopen Case for Limited Purpose of Enforcing Prior Judgment" (document #48) and "Memorandum in Support ..." (document #49), both filed June 10, 2005; and the Plaintiff's "Response ..." (document #52) filed July 11, 2005.

On July 29, 2005, the Defendants filed their "Reply ..." (document #55), and on August 2, 2005, the Plaintiff filed a "Notice of Supplemental Authority" (document #56).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. §636(c), and these motions are now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>grant</u> the Defendants' Motion to Reopen Case, and pursuant to the All Writs Act, 28 U.S.C. § 2201, will <u>enjoin</u> the Plaintiff from pursuing in arbitration claims against these Defendants and their employees that are barred by the doctrine of <u>res judicata</u>, as discussed below.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Defendants SouthTrust Bank ("the Bank") and SouthTrust Securities, Inc. ("SSI") are wholly-owned subsidiaries of nonparty SouthTrust Corporation, an Alabama bank holding company.

In his Complaint, the Plaintiff, Robert E. Drag, Sr., a citizen of Mecklenburg County, alleged that he is an experienced real estate investor and developer, that is, that he and members of his family have more than sixty years experience in the real estate business, and that prior to the events at issue herein, he, along with his son, Robert E. Drag, Jr., and daughter, Debra Drag Thompson, (collectively, "the Drags"), had enjoyed a twenty-year relationship with the Bank, primarily through the Bank's Cornelius, North Carolina branch, and that the Bank had financed "many of the Drags' real estate transactions over the years." "Amended Complaint" at 2 (document #19).

Sometime in August 2000, the Plaintiff deposited $950,000 in a money-market account at the Bank, which was to serve as collateral on two of the Drags' then-existing real estate loans.

Almost one year later, sometime in July 2001, the Plaintiff approached the Bank, seeking an additional loan of $1.25 million to finance a "mixed-use" project in Cornelius, that is, he suggested that he use the funds in his money market account to pay down the principal balance on the two existing commercial real estate loans, and then asked Defendant for a one-year construction loan to finance the mixed-use project, which would be converted to permanent financing after one year.

The Plaintiff alleged that Pamela Craver, one of the Bank's real-estate account officers, suggested that the Plaintiff meet with Howard Shoe, a Vice-President in the Bank's Asset Management unit. In the light most favorable to the Plaintiff, although Mr. Shoe is a Bank employee, his securities registrations were obtained through and overseen by SSI.

The Plaintiff alleged that during their initial meeting, Mr. Shoe advised Plaintiff that

investing the $950,000 then in the money market account in the stock market would be better than the Plaintiff's idea of paying down the principal on existing loans. Mr. Shoe also allegedly told Plaintiff that if he invested those funds in the stock market, that he "could" earn an additional $33,000.00 per year, and would be able to use that additional income to meet the interest obligations associated with the Drags' then-existing real estate loans. The Plaintiff alleged that Mr. Shoe "implied" that if Plaintiff did not maintain a stock account with the Bank, it "m[ight] be unwilling to extend any credit for the mixed-use project" and that he left the meeting with Mr. Shoe "with the impression that the only way [the Bank] was willing to finance the mixed-use project, was for Plaintiff to open an investment account." Id. at 3.

On July 29, 2001, Plaintiff opened an investment account with the Bank and deposited the entire balance of his money market account, $950,000, into the investment account. At the same time, the Plaintiff executed a "Commercial Pledge Agreement" granting the Bank a lien on the investment account, that is, the investment account served as collateral on the Drags' two then-existing loans, as well as any loan that the Bank might make for the mixed use project.

On August 10, 2001, the Bank sent the Plaintiff a "commitment letter" agreeing to make a one-year construction loan of $1.25 million for the Drags' mixed use project, provided that the Plaintiff maintained a minimum balance of $900,000 in the investment account.

The Plaintiff alleged that shortly after the investment account was opened, the account lost value, and that by June 2002, the value of the investment account was down approximately $180,000, that is, below the $900,000 minimum balance required by the loan agreement.

In July 2002, the Bank refinanced one of the Drags' permanent loans, but refused to renew a $200,000.00 revolving line of credit that had been in place since sometime in 2000.

In August 2002, the Bank decided not to extend the Drags' one-year mixed-use construction loan. The Plaintiff alleged that he was asked to submit a work out plan to Larry Reardon, the Bank's Area Real Estate Executive, and Jeff Shornock, the Bank's Special Assets Vice President, but that the Bank rejected his proposal that he pay the Bank "interest-only" on the construction loan until the building was completed and "upfitted."

The Plaintiff alleged that Mr. Shornock required him to liquidate the investment account and apply the proceeds to pay down principal on the loans, or else face immediate foreclosure because the Drags were in arrears on monthly payments.

The Plaintiff alleged that in November 2002, he was forced to sell his home, boat and "any [other] asset available" to make payments on the loans.

According to the "Forbearance Agreement" and its Addenda, discussed below, that were incorporated by reference into the Amended Complaint, on December 10, 2002, the Drags were indebted to the Bank in a total amount of $3,091,565.98, including accrued, unpaid interest.

On January 30, 2003, and at a time when the Plaintiff was represented and advised by counsel, the Drags and the Bank entered into a "Forbearance Agreement," in which the Drags admitted that they were in default on all three loans; that the Bank was entitled to immediately foreclose on the real and personal property that was collateral on those loans; and that the Bank was forbearing from foreclosing in exchange for certain consideration. Among other things, the Drags agreed to make monthly interest payments in the amount of $7,000, to pay an additional $12,000 in attorneys' fees and expenses which the Bank had incurred in "preparation, negotiation, and execution of [the] Agreement," to make additional payments as the Drags were able to sell certain of the collateral to third parties, and to pay all amounts due no later than April 2, 2003. Additionally, "to

4

induce [the Bank] to forbear from enforcing its rights under the terms of the Loan Documents," the Drags, including the Plaintiff in his individual capacity, made certain "representations, warranties, and covenants," including:

> None of the Debtors have any claim, offset, counterclaim or other basis for disputing the amounts due Lender.
>
> <u>None of the Debtors have any other claim, cause of action or other basis for asserting any charge against Lender whether arising out of the Loan Documents or any other relationship between Debtors and Lender</u>.
>
> None of the Debtors have been coerced, threatened or otherwise induced to execute this Agreement except by the consideration furnished by the Lender as set forth herein.
>
> Debtors acknowledge that the Lender is entering into this Agreement in reliance upon the representation, covenants and warranties made by them.

Forbearance Agreement, at paragraph 5, attached as Exhibit B to Defendant Bank's "Memorandum in Support ... of Motion to Dismiss" (document #31) (emphasis added).

Moreover, in a paragraph captioned "**Release by Debtors**" (emphasis in original), the Plaintiff, his son, and his daughter "waive[d], release[d], disclaim[ed], and acquit[ed] any claim, charge, counterclaim, chose in action or other basis for asserting any claim, counterclaim, defense, [or] offset" against the Bank. Id. at paragraph 6.

Finally, in a paragraph entitled "**Indemnification**" (emphasis in the original), the Drags "agree[d] to indemnify [the Bank] ... from and against any liability, claim, cost or expense (including attorney fees, court costs and other expenses) arising out of or in connection with this Agreement or the performance of any act required by this Agreement, any default by any of the Debtors under this Agreement or any misrepresentation or breach of covenant or warranty by any of the Debtors whether pursuant to this Agreement and/or Loan Documents."

Id. at paragraph 10.

On April 16, 2003, and again at a time when the Plaintiff had the benefit of the advice of his attorney, the Plaintiff, his son, and the Bank executed a "[First] Addendum to Forbearance Agreement," which recites that as of March 31, 2003, the Drags were indebted to the Bank in the amount of $3,154.035.46; that the Plaintiff and his son agreed to pay an extension fee of $7,500; that the Bank released Ms. Thompson from further liability; and that the Plaintiff and his son agreed to pay all remaining amounts due on or before June 2, 2003. Additionally, the First Addendum contained identical paragraphs, that is, representation, release, and indemnity clauses, as those quoted above. See First Addendum to Forbearance Agreement, at paragraphs 7, 8, and 12, attached as Exhibit C to Defendant Bank's "Memorandum in Support ... of Motion to Dismiss" (document #31).

On July 16, 2003, and after again receiving advice from his counsel, the Plaintiff, his son, and the Bank executed a "[Second] Addendum to Forbearance Agreement," which recites that as of that date, $1,664,871.06 remained due on the loans; that the Plaintiff and his son would pay all accrued interest and certain fees, including some of the Bank's attorneys' fees incurred in preparing the Second Addendum, contemporaneously with its execution; and that the Plaintiff's son would grant the Bank a Deed of Trust in certain real property, which previously had not served as collateral for any of the loans. The Second Addendum also re-stated the representation, release, and indemnity clauses quoted above. See Second Addendum to Forbearance Agreement, at paragraphs 5, 6, and 10, attached as Exhibit D to Defendant Bank's "Memorandum in Support ... of Motion to Dismiss" (document #31).

The record does not reflect whether the Drags satisfied the conditions of the Forbearance

6

Agreement, as modified by the two Addenda, or whether the Bank ever foreclosed on any of the Plaintiff's property. In the Amended Complaint and in his responses to the Defendants' Motion to Dismiss, however, the Plaintiff alleged that he, his son, and his daughter executed those documents "under economic duress." Amended Complaint at 5 (document #19).

On June 30, 2004, the Plaintiff filed his Complaint, which, as amended, stated claims against the Bank and SSI for violations of federal and state securities statutes, that is, the Bank Holding Company Act, 12 U.S.C. 1972(1), Section 10(b) of the Securities Exchange Act of 1934, the Investment Advisors Act of 1940, ("IAA") 15 U.S.C. § 80b-15, and N.C. Gen. Stat. $ 78A et. seq., as well as state law claims for unfair and deceptive trade practices, tortious interference with prospective economic advantage, breach of fiduciary duty, fraud, and a violation of N.C. Gen. Stat. § 75D-1, North Carolina's anti-racketeering statute. All of the Plaintiff's claims arose from the central allegation that the Plaintiff "lost approximately six million dollars ($6,000,000.00) due to [the Bank's] imprudent investment advice," that is, Mr. Shoe's advice that the Plaintiff move $950,000 from the money market account to the investment account, and that "[i]f [the Bank] had properly invested the Plaintiff's collateral in the money market funds, Plaintiff would have been able to meet all of his interest payments." Amended Complaint at 5 (document #19).

On October 13, 2004, the Defendant Bank filed its Motion to Dismiss, contending, among other things, that the Plaintiff's claims were barred by the representations and release in the Forbearance Agreement and its Addenda.

The same day, Defendant SSI filed its Joinder in the Defendant Bank's Motion to Dismiss and filed its Motion for Summary Judgment, contending that there was no evidence that the Plaintiff ever had an account or otherwise dealt with SSI and that the fact that Mr. Shoe, a Bank employee,

held securities registrations that were obtained through and overseen by SSI was insufficient as a matter of law to impute the Bank's liability, if any, to SSI.

In his brief in response to the Bank's Motion to Dismiss, the Plaintiff conceded that if valid, the representations and release in the Forbearance Agreement and its Addenda barred his claims, but contended that those contractual provisions were void because they were obtained through economic duress.

In his response to SSI's Motion for Summary Judgement, the Plaintiff made only a "public policy argument" that the fact Mr. Shoe maintained his securities registrations through SSI should have been sufficient to extend the Bank's liability to SSI. See "Plaintiff's Objection to Defendants' Reply Memoranda" at 1 (document # 45).

On February 9, 2005, the undersigned granted the Defendants' "Motion to Dismiss" (document #30) and "Defendant SouthTrust Securities, Inc.'s Motion for ... Summary Judgment" (document #28), and dismissed the Complaint with prejudice. See "Memorandum and Order" at 13 (document #46). Specifically, the Court granted the Motion to Dismiss because "the Plaintiff executed a valid release of all potential claims" against the Defendants. Id. at 11 (emphasis added). For the same reason, as well as because there is no "authority even considering, much less applying, the Plaintiff's policy argument" in support of its claims against SSI, the Court granted SSI's Motion for Summary Judgment. Id. at 11-12.

The same day, the Clerk entered a "Judgment" on behalf of the Defendants. See Document #47.

The docket reflects, and the Plaintiff does not dispute, that on February 10, 2005, copies of both the Court's Memorandum and Order and the Judgment were mailed to and, shortly thereafter,

received by the parties' respective counsel. However, the Plaintiff never filed a motion seeking reconsideration of the Court's decision nor did he file an appeal with the Fourth Circuit Court of Appeals, and the time for doing either has long expired. Accordingly, as the Defendants point out in their present briefs, the Court's previous Memorandum and Order, including the findings of facts and conclusions of law stated therein, and the Judgment are now final in all respects.

Nevertheless, on April 12, 2005, the Plaintiff filed a "Statement of Claim ... [for] Arbitration" with the National Association of Securities Dealers ("NASD"), purporting to allege the same claims, that is, those stated in the Complaint, plus claims for "failing to supervise" and "selling away,"[1] against SSI and Mr. Shoe, as well as against John Porter and Sharon Taylor, SSI's Chief Executive Officer ("CEO") and Chief Compliance Officer ("CCO"). See Exhibit 5 to Defendants' "Memorandum in Support ..." at 9-10 (document #49).

In his Statement of Claim for Arbitration, the Plaintiff recited the facts, discussed above, and made only the same "policy argument" that the Court previously considered and rejected when the Defendants' Motion to Dismiss and SSI's Motion for Summary Judgment were granted. Id. at 2-9. Although Mr. Shoe, Mr. Porter, and Ms. Taylor were not Defendants in this lawsuit, the Plaintiff's rationale for naming them in the arbitration proceeding is the same as the reasoning he advanced in the Amended Complaint, that is, the alleged "imprudent" investment advice given by Mr. Shoe, a Bank employee, and SSI's alleged failure to properly supervise him. Id. at 9-10.

On June 10, 2005, the Defendants filed their "Motion to Reopen Case for Limited Purpose of Enforcing Prior Judgment" (document #48), contending that the final Judgment in this matter acts

---

[1]"Selling away" is "a term of art in the securities field used when a registered representative sells securities not approved for sale by the employer" and is a sub-set of theories of recovery falling under "failure to supervise." New Life Brokerage Services, Inc. v. Cal-Surance Associates, Inc., 222 F. Supp. 2d 94, 99 (D. Me. 2002).

as res judicata to the claims that the Plaintiff is attempting to assert in the arbitration proceeding and requesting that the Court enjoin the Plaintiff from continuing the arbitration.

In his Response, the Plaintiff acknowledges that he does not have the right to pursue arbitration under an agreement between the parties, but, instead, contends that his right to arbitrate arises under NASD rules. See Plaintiff's "Response ..." at 3 (document #52). Moreover, the Plaintiff concedes that the Court has the authority, pursuant to the All Writs Act, 28 U.S.C. § 2201, to enjoin him from pursuing arbitration claims against these Defendants and their agents to the extent that those claims are barred by the doctrine of res judicata. Id. at 4-5.

The Plaintiff seeks to avoid the application of res judicata on the basis that Mr. Shoe, Mr. Porter, and Ms. Taylor were not parties to and that he did not raise his "selling away" and "failure to supervise" claims in this lawsuit. Id. at 2. The Plaintiff does not argue, however, and there is no indication in the record that he was in any way precluded from naming these individuals as Defendants or raising these additional claims in his Complaint. Id.

The Defendants' motion has been fully briefed as set forth above, and is, therefore, ripe for determination.

## II. DISCUSSION

Pursuant to the All Writs Act, 28 U.S.C § 1651, the federal courts have the jurisdiction and authority to enforce prior judgments and to prevent collateral attack on their authority. Indeed, the United States Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."

United States v. New York Telephone Co., 434 U.S. 159, 172 (1977). Similarly, the Fourth Circuit Court of Appeals has held that the All Writs Act "empowers a federal court to enjoin parties before it from attempting to relitigate decided issues and to prevent collateral attack of its judgments." Farmers Bank v. Kittay (In re March), 988 F.2d 498, 500 (4th Cir. 1993). Accord United States v. Abdelhadi, 327 F. Supp. 2d 587, 598 (E.D. Va. 2004) ("[w]here an injunction is proper in order to protect or effectuate the judgments of a federal court, it is within that court's power to issue the injunction under the All Writs Act").

Although there is no Fourth Circuit authority directly on point, courts that have considered the issue have held that the All Writs Act empowers the court to enjoin parties from seeking to re-litigate in arbitration matters that have already been adjudicated by a federal court. See Y & A Group Sec. Litig., 38 F.3d 380, 382 (8th Cir. 1994) ("[n]o matter what, courts have the power to defend their judgments as res judicata, including the power to enjoin or stay subsequent arbitrations"); Kelly v. Merrill Lynch, Pierce, Fenner & Smith, 985 F.2d 1067, 1069 (11th Cir. 1993) ("[t]he All-Writs Act ... gives federal courts broad injunctive powers to protect their own judgments ... including the authority to enjoin arbitration to prevent re-litigation"); Miller Brewing Co. v. Ft. Worth Distributing Co., 781 F.2d 494, 499 (5th Cir. 1986) ("parties should be barred from seeking relief from arbitration panels when, under the doctrine of res judicata, they would be barred from seeking relief in the courts"); and Central Transp., Inc. v. Central States, Southeast and Southwest Areas Pension Fund, 639 F. Supp. 788 (E.D. Tenn. 1986), aff'd, 816 F.2d 678 (6th Cir. 1987).

The only remaining question then, as the Plaintiff concedes, is whether and to what extent the claims he seeks to prosecute in the arbitration proceeding are barred under the doctrine of res judicata by the prior Judgment in this proceeding.

11

Generally, the principle of res judicata precludes subsequent litigation of a formerly adjudicated claim. Accord Cromwell v. County of Sac, 94 U.S. 351, 352 (1876); and Adkins v. Allstate Ins. Co., 729 F. 2d 974, 976 (4th Cir. 1984) (final judgment entered in favor of employer barred subsequent action on similar claim against employee). Res judicata, or claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores v. Moitie, 452 U.S. 394, 398 (1981) (emphasis added). A final judgment on the merits resolves the instant disputes between the parties, and preserving the effect of that decision "encourages reliance on judicial decisions, bars vexations litigation, and frees the courts to resolve other disputes." Brown v. Felsen, 442 U.S. 127, 131 (1979).

A three-part test is applied to determine whether res judicata prevents a party from bringing a subsequent action on a claim that has been adjudicated on the merits, that is, there must be "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." Peuschel v. United States, 369 F. 3d 345, 354 (4th Cir. 2004). Accord Shoup v. Bell & Howell Co., 872 F. 2d 1178, 1179 (4th Cir. 1989).

Concerning the second prong of res judicata, the Fourth Circuit emphasizes that all claims arising from the same transaction or occurrence are barred from re-litigation, even if some claims were not litigated in the first action. Accord Pueschel, 369 F. 3d at 356. In other words, res judicata "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." Id. citing Meekins v. United Transp. Union, 946 F. 2d 1054, 1057 (4th Cir. 1991)

12

(plaintiff, as "master of [his] complaint," should identify and allege all claims that could be brought in the action or be barred from subsequent litigation based on res judicata).

The third element of res judicata requires a determination of who is bound by the previous judgment. The Fourth Circuit requires "identity of parties," or a similarity among parties in a prior action and parties in the second action. Nash County Bd. of Educ. v. Biltmore Co., 640 F. 2d 484, 486 (4th Cir. 1981) (valid and final judgment on a claim binds parties to that action as well as their privies). "Privity is a term without any generally prevailing definition" but those who represent the same legal interest are considered in privity for res judicata purposes. Id. at 493.

As noted above, the Fourth Circuit has held that where the claims in both lawsuits, or as in this case, in a lawsuit and subsequent arbitration proceeding, arose from actions performed by employees acting within the scope of their employment, a prior adjudication in favor of the employer bars subsequent litigation of the same or similar claims against the employees. Adkins, 729 F. 2d at 976 (employee's status as a defendant in second proceeding "in no way relieves plaintiff of the constraints of the doctrine of res judicata").

Applying these legal principles to the record in this case, it is clear that the claims that the Plaintiff is attempting to assert in the arbitration proceeding are barred by res judicata as to Defendant SSI, the Defendant Bank's employee, Mr. Shoe, and SSI's employees, Mr. Porter and Ms. Taylor, and that, accordingly, the Defendants are entitled to an injunction prohibiting the Plaintiff from further pursuing the arbitration.

As an initial matter, it is undisputed that there has been a prior adjudication on the merits in this action, and, accordingly, the Defendant has satisfied the first element of the res judicata test as to all claims the Plaintiff raised in the arbitration. Moreover, to the extent that the Plaintiff has

merely re-asserted identical claims against the same party, that is, Defendant SSI, those claims clearly are barred. Accord Pueschel, 369 F. 3d at 356.

Concerning the second element of the res judicata analysis and examining the two claims that were not expressly pled in the Complaint but were alleged in the arbitration proceeding, the Plaintiff contends, but cites no authority in support of the position, that his claims for "selling away" and "failure to supervise" are "typically" raised in arbitration before the NASD rather than in court. See Plaintiff's "Response ..." at 2 (document #52). As the Defendants point out in their Reply, however, the Plaintiff could have asserted these claims under §10(b) of the Securities Exchange Act of 1934, which was pled generally as a basis for recovery in the Complaint. Accord New Life Brokerage Services, Inc. v. Cal-Surance Associates, Inc., 222 F. Supp. 2d 94, 99 (D. Me. 2002). The Plaintiff also could have asserted his failure to supervise claim under § 20 of the 1934 Act. See 15 U.S.C. § 78t. Moreover, however denominated, the Plaintiff's arbitration claims arise from precisely the same set of facts that he alleged in his Complaint, and therefore he was bound to include them in his lawsuit or have them thereafter barred under res judicata. Accord Pueschel, 369 F. 3d at 356 (all claims arising from the same transaction or occurrence are barred from re-litigation, even if some claims were not litigated in the first action).

As to the final element of the res judicata analysis and considering whether the adjudication of the Plaintiff's claims against the Defendant Bank and Defendant SSI also bars claims against Mr. Shoe, Mr. Porter, and Ms. Taylor, it is clear that these employees stand in privity with their respective employers because the claims the Plaintiff raised in the arbitration are based on their alleged actions, or inactions, performed in the scope of their employment. Indeed, as the Plaintiff has stated in both proceedings, Mr. Shoe's "imprudent" investment advice is at the heart of all his

claims.  Moreover, the Plaintiff's allegation in the arbitration that Mr. Porter and Ms. Taylor, in their respective capacities as SSI's CEO and CCO, failed to supervise Mr. Shoe is merely an elaboration of the more general allegation in the Complaint that SSI failed to supervise Mr. Shoe properly.

In short, where the Plaintiff's arbitration claims against Mr. Shoe, Mr. Porter, and Ms. Taylor arose from actions allegedly performed by them while acting within the scope of their employment, the prior adjudication in favor of their employers bars the arbitration claims filed subsequently against them.  Accord  Adkins, 729 F. 2d at 976 (employee's status as a defendant in second proceeding "in no way relieves plaintiff of the constraints of the doctrine of res judicata").

Having concluded that the claims that the Plaintiff seeks to re-litigate in an arbitration proceeding are barred under the doctrine of res judicata, and to prevent collateral attack on the Judgment rendered in this case, the Defendants' "Motion to Reopen Case for Limited Purpose of Enforcing Prior Judgment" will be granted.

### III.  ORDER

**NOW THEREFORE, IT IS ORDERED:**

1.     The Defendants' "Motion to Reopen Case for Limited Purpose of Enforcing Prior Judgment" (document #48) is **GRANTED**, that is, the Plaintiff is **ENJOINED** from prosecuting the arbitration proceeding captioned Robert E. Drag, Sr. v. Southtrust Securities, Inc., Howard L. Shoe, Jr., John D. Porter, Sr., and Sharon D. Taylor, and further identified as "NASD Dispute Resolution Arbitration Number 05-01964."

2.     The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties; and to Robert N. Hunter, Public Arbitrator, NASD Dispute Resolution, 1735 K. Street,

N.W., Washington, DC, 20006.

**SO ORDERED, ADJUDGED AND DECREED.**

**Signed: August 4, 2005**

*Carl Horn, III*
_____

Carl Horn, III
United States Magistrate Judge